[Civ. No. 1483.    Third Appellate District.—March 11, 1916.]

SAGE LAND AND IMPROVEMENT COMPANY (a Corporation), Appellant, v. HALE McCOWEN et al., Respondents.

VENDOR AND PURCHASER—CONTRACT FOR SALE OF SEVERAL PARCELS—FAILURE OF TITLE TO SINGLE PARCEL—NONFORFEITURE OF CONTRACT. Under a written contract for the sale and purchase of several tracts of land comprising over one thousand acres which had been segregated into separate parcels, so described in the contract, and an acreage price placed thereon, the vendee cannot decline to purchase a specific parcel on the ground that the title to another parcel had failed, where the contract expressly provides that should the title to any of the described lands fail, it shall not work a forfeiture of the contract, but a deed to any such lands, together with the price, shall be placed in escrow until the title is perfected, provided the same is perfected within twelve months.

ID. — DEFECTS IN TITLE TO SPECIFIC PARCEL — ESCROW AGREEMENT — EFFECT OF.—Under the terms of such a contract the vendee cannot complain of alleged defects in the title to a specific parcel, where a suit to quiet title was brought as to such parcel, the title quieted thereto, and a deed thereof placed in escrow, upon the sole and

only condition that it and the price therefor should there remain for the period of one year to provide against the possible contingency of the defendants in such suit, who were served by publication, appearing and opening up their default.

ID.—DEFECTS IN TITLE—WAIVER.—Where under a contract of sale it is the duty of a purchaser to point out defects in title, his failure so to do is a waiver of the defects.

APPEAL from a judgment of the Superior Court of Mendocino County, and from an order denying a new trial. J. Q. White, Judge.

The facts are stated in the opinion of the court.

Mannon & Mannon, for Appellant.

Robert Duncan, for Respondents.

BURNETT, J.—On September 2, 1911, appellant and Louis A. Moody, Fannie T. McCowen, and Hale McCowen, her husband, entered into a written agreement for the sale and purchase of several tracts of land, comprising 1404 acres, appellant agreeing to pay the sum of $25 per acre; "for all of the above described land, the sum of $5,000.00 gold coin upon the execution and delivery of this contract, and the balance of $—— upon the approval and acceptance of a clear and unencumbered title to the above described property and the whole thereof.

"And the said parties of the first part (respondents) agree to furnish to said party of the second part, within ten days from date hereof, complete abstracts of title to said lands and premises above described, and the said party of the second part shall have thirty days after the receipt of said abstract in which to examine the same and report defects, and should any defects be found in the title to said land, or any part thereof, parties of the first part will clear such defects within a reasonable time not exceeding six months, and this contract shall remain in full force and effect.

"It is further understood and agreed that should parties of the first part refuse or neglect to clear such defects within the time above specified, then and in that case, party of the second part will be under no obligation in law or equity to purchase said premises, and all moneys paid thereunder shall

be returned to the said party of the second part with interest thereon at the rate of 6 per cent per annum. . . .

*"It is further understood and agreed, that should the title to any of the above described lands fail, it shall not work a forfeiture of this contract, but a deed properly executed by the parties of the first part, to the party of the second part, for all the lands to which the title shall have failed, together with the sum of $25.00 per acre for such land, shall be placed in the Commercial Bank of Ukiah, at Ukiah, California, to remain there until the title to said lands shall have been perfected and the title acceptable to party of the second part, but it is understood and agreed that the said title shall be perfected within a reasonable time after said deed and said money is placed in escrow, not exceeding twelve months."*

We have italicized the portion of said agreement which is peculiar and which has given rise to some controversy here. The contract was executed for the company by its duly authorized agent, D. P. Simons, and Mr. Simons employed as his attorneys in connection with the contract, Messrs. Preston & Preston of Ukiah.

Abstracts of title to the lands described in said agreement were furnished by the vendors to Messrs. Preston & Preston, representing the said corporation, and, previous to March 2, 1912, the attorneys had approved the title to all the lands described in the contract with the exception of 633.37 acres consisting of two separate tracts, one containing 313.37 acres, designated hereinafter as "scrip land," and the other 320 acres, as the "tax title land." Mr. Simons, on behalf of the appellant, paid Preston & Preston five thousand dollars, which was in due time paid over to the vendors on the execution of the contract, and, on September 21, 1911, he also sent to J. W. Preston, Esq., sufficient funds to pay for all of the lands to which title had been approved. Thereafter the vendors conveyed to appellant all of the said lands except the said 633.37 acres and Mr. Preston paid them therefor at the rate of $25 per acre. Two separate deeds were made and placed in the bank in escrow, one for said "scrip land" and the other for the "tax title land." There is no controversy as to the former, it being admitted that respondents had no title thereto. No defects in said tax title were pointed out by appellant but its attorneys, said Preston & Preston, requested that a suit to quiet title against the possible claim of one Mary

G. Andenried be brought for the reason that the title was, in part, at least, based on a tax deed. The vendors complied with this request and employed said attorneys for appellant to bring said action. After this was accomplished said attorneys again requested the vendors to wait for a year to elapse to provide against the contingency of Mary G. Andenried appearing in the suit and asking that the proceedings be opened up, as the summons had been served by publication and judgment was taken by default. The vendors agreed to this, and said deeds were placed in escrow as aforesaid with the sum of $15,834.25 in cash, and a written agreement signed by Hale McCowen, Jr., as attorney for L. A. Moody and Hale McCowen and Preston & Preston as attorneys for appellant, executed May 2, 1912. This agreement referred to the said contract of September 2, 1911, and especially the provision which we have hereinbefore italicized and provided that said deeds and money "are to be held subject to the following terms:

"I. The deeds are, or either of them is, to be delivered to The Sage Land and Improvement Company, upon demand at any time within twelve months from the date thereof;

"II. Upon the delivery of each deed to The Sage Land and Improvement Company, the amount of money due under the deed so delivered by the provision hereinabove set forth is to be delivered to L. A. Moody, Fannie T. McCowen and Hale McCowen, her husband;

"III. If at the end of twelve months from the date hereof the deeds are, or either of them is, still in the possession of the depository they are, or it is, to be returned to the depositors, and money remaining unpaid is to be returned to The Sage Land and Improvement Company." Then follows a description of each of the two said tracts.

In August, 1912, Mr. Simons was succeeded by one E. J. James as agent for appellant, and, on March 3, 1913, as such agent, he demanded of the bank the return of said $15,834.25, claiming that the title to said lands had not been perfected and rendered acceptable to appellant within the twelve months. On the 3d or 4th of said month Preston & Preston, acting for the vendors, demanded of the bank eight thousand dollars of said money, claiming that the escrow condition as to said tax title land had been complied with and that respondents were therefore entitled to said sum. The

bank refused to pay over any of said money, and plaintiff thereupon brought the action against said bank for the entire sum and, upon proper proceedings, the said depository paid the money into court and was discharged from further liability, the vendors being substituted as parties defendant. After trial the court found in accordance with the position of the vendors, and held that they were entitled to said eight thousand dollars with interest. The appeal is from said judgment and from an order denying a motion for a new trial.

The first contention of appellant is "that, in view of the conceded fact that the title to the 'scrip land' is invalid, and assuming that the title to the 'tax title land' is good and marketable, still, under the terms of its contract, this appellant was entitled to both the 'scrip land' and the 'tax title land' or it was not bound to take any thereof and that, therefore, the decision of the superior court compelling it to take and pay for the 'tax title land' is erroneous as a matter of law."

We cannot so read the contract of the parties. They expressly provided that "should title to any of the above described lands fail it shall not work a forfeiture of this contract." It must be remembered that the land had been segregated into separate parcels and so described in said contract and the price was placed at $25 per acre. "The above described lands" refers, of course, to all the lands that were contemplated by said agreement and described therein. It seems to us that more accurate language could hardly have been selected to express an agreement that the several parcels should be treated separately, and that if the title to any should fail, it would not affect the contract as to those parcels impressed with a good title. In view of a previous provision in the contract to the effect that if the parties owning the lands should neglect or refuse to clear defects within a certain time, the party purchasing the lands should not be required to purchase said premises, and that any money paid therefor should be returned, it is possible that the purchaser might have declined to purchase at all if there was not a good title to all of the land, but surely it was not contemplated that the purchaser might take certain tracts having a good title and reject others. If such was the intention, it must be admitted that the parties were very unfortunate in the selection of terms to express such intention.

There would seem to be even less room for doubt as to the said agreement of March 2, 1912.   Therein it is provided that certain deeds are, or either of them is, to be delivered to the Sage Land and Improvement Company, and upon the delivery of each deed the amount of money due under said deed is to be paid over and, if at the end of the year, either of said deeds remains in the possession of the depository, it is to be returned to the grantors and the corresponding amount returned to appellant.   This language cannot be interpreted so as to tie the two parcels together.   The natural construction, as we view it, is that in case of title to either, that parcel should be paid for on delivery of the deed.   The parties undoubtedly so understood the agreement and so construed it. As evidence of this we may refer to the testimony of Mr. Simons, the accredited representative of appellant, in which he declared that he thought at that time that he would have to take the tax title.   ''This land, the tax title piece, is light timber and the scrip piece is heavier and this question as to whether I would be obliged to take the light piece and not get the better timber did not arise until the question of these titles came up.   It was understood at the time of the deposit that if the tax title piece was made good within the year and the scripped was not, that I would have to take the tax title piece.''   Of course, they expected both pieces to be clear at the end of the year and appellant preferred the scrip land, naturally, as there was better timber thereon, but there was willingness to take the chance of getting a good title to either or both.

We conclude that appellant's first point is not well taken.

The second is that respondents did not furnish a marketable title to said ''tax title land.''   But, precedent to any consideration of the declared defects in said title, we should regard the finding of the trial court: ''That the said deed to said 320-acre tract of land, the title to which was quieted as aforesaid and the said sum of eight thousand dollars in cash, being twenty-five dollars an acre therefor, were placed in said Commercial Bank of Ukiah, the 2nd day of March, A. D. 1912, upon the sole and only condition that they should remain there for the period of one year so that the time for appearance of any of the defendants in said suits to quiet title should expire and that no one should appear in said actions during said time; that upon the expiration of said time, if no appearance

was made, that the deed to said 320-acre tract should be delivered to the plaintiff in this action and the said sum of money, to wit, eight thousand dollars, should be delivered and paid to the said parties of the first part in said contract, but if any of said defendants should appear in said action during said time, then and in that event the money should be returned to the plaintiff and the said deed to the parties of the first part in said contract." It is further found that no one so appeared within the year, and this is not disputed. The situation is, therefore, that if said finding quoted as above is, with its necessary implications, supported by competent evidence, the question as to any actual defects in said title becomes immaterial and said finding, in connection with admitted facts, is sufficient to warrant the judgment in the case.

Said finding would seem to be supported by the following testimony of Mr. Simons: "It is a fact that when this money and those deeds were placed in the Commercial Bank of Ukiah that the deed to the tax title lands was placed there upon the sole and only condition that if Mrs. Andenried appeared within the year that I was not to take the lands, and if she did not appear within a year that I was to take the piece of land if that title would be perfected. . . . I understood that the title would not be perfected—would not be perfected for one year."

H. L. Preston testified that he was a member of the law firm of Preston & Preston, and that they were employed to pass on all titles for the lands purchased by him for the Sage Land and Improvement Company; that he drew said contract of February 2, 1911, and afterward Mr. Simons went away and left it with said firm "and Mr. McCowen delivered his abstracts . . . and I would take them up and examine them and render a report on them to Mr. Simons and I give Mr. McCowen a copy of the report and then if there were any defects in them we had them cured, such as getting quitclaim deeds and patents and when the title to one piece was cured why we paid for it and took the deed to the Sage Land and Improvement Company and recorded the deed and had the abstract brought down to date to that piece and put our opinion in the report and then I sent them to Mr. Simons; he left the money with us and intended as often as we approved a title to take it and pay for it." He furthermore testified that he never found and pointed out to any of the respondents

any defect in the title to this "tax title land" and that the suit to quiet title was "just an extraordinary precaution because the Sages were nonresidents of California and they were so particular about everything we thought as a double precaution we would have the title quieted. I told Mr. McCowen I thought it would be better to have the suits brought and he said that it was all right to go ahead and have it done. So he said he would like for Hale McCowen, Jr., to attend to the business and we told him it was all right, we would oversee it and help him and I communicated to Simons and he said that it was all right for us to attend to it, and the proceedings which have been introduced in evidence here were taken as a result of that." He testified, furthermore, that after the decree was rendered he talked the matter over with Mr. McCowen, and told him that since service was had by publication he ought to wait for twelve months for the money to give the parties an opportunity to appear, and that McCowen objected, but finally consented, and it was decided "to put it up in the bank according to the contract and wait the twelve months and they both agreed to it. The next day after the decrees were entered we drew this deed to the tax title and these two deeds and money were put in the bank" with the said written agreement of March 2, 1912. "We talked to Mr. Simons about the matter of this escrow with regard to the tax title and had correspondence about it before our talk with Mr. McCowen, about the 29th day of January, 1912, and talked about it then; it was understood that afternoon or day before, we talked about it over the phone. We had previously discussed that agreement with Mr. Simons and Mr. McCowen and told Mr. Simons what it was to be. . . . We already accepted the title to the tax title and all we were doing was to insure that this woman would not appear within the year, that was the only condition. Never dreamed until Mr. James came here but what we would have to take each piece as the title was perfected and I told Mr. James that when he came here. . . . When this suit to quiet title business came up why we explained it to Mr. McCowen and also to Mr. Simons and it was agreed between us that Hale McCowen, Jr., was to do the work and we were to oversee it."

There is other evidence clearly related to the point before us, but sufficient has been quoted to show, as we believe, that such was the agreement, as found by the court, when the said

deeds and money were deposited in escrow, and, also, that Preston & Preston were authorized as the agents of appellant to make such agreement and, moreover, that, through Mr. Simons, appellant was fully informed of the whole transaction, made no objection whatever, but on the contrary, agreed to and ratified the same.

There was no concealment, no misrepresentation, no fraud whatever. In fact, there is no such claim and we are at a loss to understand how it could be held that said finding is entirely unsupported.

While the foregoing testimony was being taken objections to certain questions were overruled by the court, but we deem specific notice thereof unnecessary, as the evidence admitted without objection is equivalent to what we have set forth.

Another circumstance of moment, apart from the said supplemental agreement of March 2, 1912, appearing from what we have quoted, is that under the contract it was the duty of appellant to point out any defects in the title if any existed. Nothing of the kind was done. In fact, the contrary was conceded by its attorneys. It would seem, therefore, that the defects, if any existed, were waived.

In *Easton* v. *Montgomery*, 90 Cal. 307, 313, [25 Am. St. Rep. 123, 27 Pac. 280], after holding that it was the duty of the vendee to examine the title, the supreme court said: "If, upon such examination, it appeared to him that the title was defective, it then became his duty to report to the vendor the particulars wherein such defects were claimed to exist, and in the absence of any time fixed by the agreement within which the vendor should remove these defects, or satisfy his objection, a reasonable time would be allowed therefor. The burden is on the vendee to point out the defects in the title. (*Dwight* v. *Cutler*, 3 Mich. 566, [64 Am. Dec. 105].)"

As to the other proposition, concerning the sufficiency of the proceedings culminating in the sale of said property for delinquent taxes, and the validity of the deeds executed in pursuance thereof, it is unnecessary to inquire specifically if we are right in the conclusion as to said contract of March 2, 1912, although we may say that the various objections urged by appellant to said tax title appear to be satisfactorily answered in the argument of respondents. Likewise, the point made that the trial court abused its discretion in refusing to open up the case after it had been submitted, in order that

appellant might offer the assessment rolls in evidence for the purpose of showing that they did not have attached thereto the affidavits of the assessor and clerk of the board of supervisors as required by the statute, becomes unimportant but as to that, in view of the counter-affidavits and the opportunity which appellant had previously to discover the facts, we think it cannot be said there was any abuse of discretion.

As we understand the record, we think the judgment and order should be affirmed, and it is so ordered.

Chipman, P. J., and Hart, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 10, 1916, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 8, 1916.